[Nos. 45570, 45634, 45811, 45922, 46328, 47257, 47285.     En·Banc.     April 16, 1981.]

THE STATE OF WASHINGTON, *Respondent*, v. MORRIS JOHN FRAMPTON, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. FLOYD WILLIAM MARR, ET AL, *Appellants*.

THE STATE OF WASHINGTON, *Respondent*, v. NEDLEY G. NORMAN, JR., *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. HOWARD EUGENE FOREN, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL G. ROBTOY, *Appellant*.

THE STATE OF WASHINGTON, *Appellant*, v. TIMOTHY ROBERT PAULEY, *Defendant*, SCOTT CARL SMITH, *Respondent*.

THE STATE OF WASHINGTON, *Appellant*, v. ROBERT DEANGELIS, *Respondent*.

*Timothy K. Ford, Anthony Savage, Jr., Carl Teitge, Robert Deutscher, Ellen Yaroshefsky, David Middaugh, Stewart Riley,* and *John L. Farra,* for defendants.

*Norm Maleng, Prosecuting Attorney for King County, Gregory P. Canova, Stephen E. Moore, J. Robin Hunt, Senior Deputies,* and *Frederick L. Yeatts, Senior Trial Attorney; Don Herron, Prosecuting Attorney for Pierce County, Joseph D. Mladinov, Senior Deputy,* and *Ellsworth Connolly, Deputy; Jeff Campiche, Prosecuting Attorney for Pacific County,* and *Jeremy Randolph, Special Deputy; C. Danny Clem, Prosecuting Attorney for Kitsap County,* and *Ronald A. Franz, Chief Civil Deputy;* and *Curtis M. Janhunen, Prosecuting Attorney for Grays Harbor County,* for State.

DOLLIVER, J.—These cases are before the court pursuant to an order of October 10, 1980, calling for briefs and oral argument on certain issues relative to the death penalty. All of the cases involve an attempt by the State to impose the death penalty for the crime of aggravated murder in the first degree. RCW 9A.32.040–.047; RCW 10.94.010–.030.

Nedley Norman, Jr., Howard Foren, Michael Robtoy, Floyd William Marr, and Morris Frampton are here on appeal from first degree murder convictions and sentences of death imposed after sentencing hearings held pursuant to RCW 10.94.020. Each of their death sentences was imposed by the trial judge pursuant to RCW 9A.32.040(1), after the jury returned affirmative answers to each of the sentencing questions posed by RCW 10.94.020(8)–(10).

Douglas Justice is here on appeal from his conviction of first degree murder and the sentence of life imprisonment without possibility of parole or release imposed on him after his jury returned a negative answer to the "mitigating circumstances" sentencing question posed by RCW 10.94-.020(8).

Scott Smith and Robert DeAngelis are here on interlocutory appeals by the State of trial court rulings that the death penalty could not be constitutionally imposed in light of *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980), and *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). In Smith's case, the trial court ruled

the death penalty was unconstitutional in light of *Martin,* but held that the defendant could still receive life imprisonment without possibility of parole if he was convicted on a not guilty plea. In the DeAngelis case, the trial court dismissed the notice of death penalty without indicating what punishment was available if the defendant was convicted at trial.

Except for Robtoy, who declined to plead and had a plea of not guilty entered by the court, all defendants have at all times pleaded not guilty to these murder charges.

Defendant Smith contests our review of the order issued by the trial court. This matter was considered by the Supreme Court Commissioner and in an order dated September 23, 1980, the Commissioner ruled the order of the trial court to be appealable. On October 23, 1980, we denied Smith's motion to modify the Commissioner's ruling. His case is properly before us. Defendant Pauley is not a participant in this proceeding.

The five issues which the court accepted for argument are:

1. Whether the present statutory scheme for imposing the death penalty is unconstitutional in light of *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980);

2. If so, may the State still seek and have imposed in cases of aggravated first degree murder, the punishment of life imprisonment without the possibility of parole;

3. Whether the special sentencing proceeding for imposing the death penalty unconstitutionally withdraws from the jury the question of the appropriate sentence;

4. Whether it is possible for a jury to make a prediction as to the future dangerousness of a defendant which is required by RCW 10.94.020(10)(b); and

5. Whether death by hanging is cruel and unusual punishment.

The issues will be dealt with in this sequence.

We are not considering (1) whether the death penalty is per se unconstitutional and violates the Eighth Amendment and Const. art. 1, § 14, or (2) whether "the sentence of

death [in any of these cases] is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.94.030(3)(b).

I

RCW 10.94.020(1) provides:

If notice of intention to request the death penalty has been served and filed by the prosecution in accordance with RCW 10.94.010, then a special sentencing proceeding shall be held in the event the defendant is found guilty of murder in the first degree under RCW 9A.32-.030(1)(a).

RCW 10.94.020(2) provides, in part:

[If] the trial jury returns a verdict of murder in the first degree under RCW 9A.32.030(1)(a), then, at such time as the verdict is returned, the trial judge shall reconvene the same trial jury to determine in a separate special sentencing proceeding whether there are one or more aggravating . . . and . . . mitigating circumstances . . . and to answer special questions . . .

In *State v. Martin, supra* at 8, the court found there was "no current statutory provision that authorizes the impaneling of a special jury to decide the death penalty issue when a capital defendant pleads guilty." We held that since there is no statutory means by which the death penalty can be imposed when a defendant pleads guilty, the maximum penalty which could be imposed on a plea of guilty to first degree murder is life imprisonment with a possibility of parole.

The State now argues, however, that within existing statutes there is a method whereby the death penalty can be imposed when there is a guilty plea in a case of first degree murder. To reach this result, it urges that we construe RCW 10.49.010 in pari materia with either RCW 10.94-.020(1) or RCW 10.94.020(2).

RCW 10.49.010, a statute enacted in 1854 and unchanged since then, provides:

If, on the arraignment of any person, he shall plead guilty, if the offense charged be not murder, the court

shall, in their discretion, hear testimony, and determine the amount and kind of punishment to be inflicted; but if the defendant plead guilty to a charge of murder, a jury shall be impaneled to hear testimony, and determine the degree of murder and the punishment therefor.

Under the analysis of the State, following a plea of guilty, a jury, as authorized by RCW 10.49.010, would be impaneled under a "special sentencing proceeding" (RCW 10.94-.020(1), (2)), deliberate pursuant to the procedures contained in RCW 10.94.020(3)–(10), answer the special questions under that portion of the statute and determine whether the sentence would be death or life imprisonment without parole.

Prior to the enactment of RCW 9A.32 (1975 and 1977) and RCW 10.94 (1977), the Washington statutes relative to trial by jury and murder in the first degree were RCW 9.48.030, RCW 10.01.060 and RCW 10.49.010. A guilty plea was allowed and, in the event of such a plea, it was mandatory that a jury then "be impaneled to hear testimony, and determine the degree of murder and the punishment therefor." RCW 10.49.010. Under this system, the degree of murder and the punishment was determined by the jury whether a defendant pleaded guilty or not guilty. *See State v. Davis,* 6 Wn.2d 696, 108 P.2d 641 (1940).

In *State v. Martin,* we held a defendant could plead guilty under the current statutes. Given this ruling, the question posed by the State is: When a defendant pleads guilty to aggravated first degree murder is a jury to be impaneled under RCW 10.49.010 to determine the degree of murder and the punishment therefor, and is that same jury then to conduct a special sentencing proceeding under RCW 10.94.020? Did the legislature intend the old scheme for impaneling a jury in the event of a guilty plea to be continued under the new statutes? We do not believe it did.

If the legislature had meant RCW 10.49.010 and RCW 10.94.020(1) and (2) to be read together when a defendant pleaded guilty, it is unreasonable to believe it would have failed to say so. RCW 9A.32 and RCW 10.94 are

carefully drafted, complex and interrelated statutes. They represent an attempt by the legislature to provide for the imposition of the death penalty when certain conditions have been met. It is readily apparent that RCW 9A.32 and RCW 10.94 as they pertain to the death penalty are meant to be read as an integrated whole. Nowhere in the legislative history or in the language of the statute is there the slightest suggestion to the contrary.

RCW 10.94.010 sets up a procedure whereby:

> When a defendant is charged with the crime of murder in the first degree as defined in RCW 9A.32.030(1)(a), the prosecuting attorney or the prosecuting attorney's designee shall file a written notice of intention to request a proceeding to determine whether or not the death penalty should be imposed when the prosecution has reason to believe that one or more aggravating circumstances, as set forth in RCW 9A.32.045 as now or hereafter amended, was present and the prosecution intends to prove the presence of such circumstance or circumstances in a special sentencing proceeding under RCW 10.94.020.

The special sentencing proceeding provided by RCW 10.94-.020(1) and (2) is described in great detail in RCW 10.94-.020(3)–(10). For this court now to say the legislature, in the case of a guilty plea when the State requests the death penalty, expected or authorized reference to RCW 10.49-.010, an 1854 statute whose entire reference had been to previous homicide statutes, places too great a strain on statutory construction.

In addition to the lack of reference to RCW 10.49.010 in the death penalty statutes, the legislative history shows a failure by the legislature to consider the scheme proposed by the State. As was outlined in *State v. Martin, supra* at 19 (Horowitz, J., concurring), there was language in House Bill 615, which contained the original version of RCW 10.94, providing that "if the defendant pleaded guilty to murder in the first degree, the death penalty proceeding shall be conducted before a jury impaneled for that purpose and such jury cannot be waived.'" House Bill 615, § 68, 45th Legislature (1977).

House Bill 615 introduced in the 1977 regular session of the legislature, was stated to be the "Comprehensive Sentencing Act of 1977". House Bill 615, § 1. It was referred to the House Committee on Judiciary. While in committee, it was replaced by Substitute House Bill 615 which was limited to the death penalty and was passed by the House on May 2, 1977. The language in section 68, *ante,* was eliminated from Substitute House Bill 615. House Journal, 45th Legislature, at 1178.

Substitute House Bill 615 went to the Senate where it was referred to the Senate Judiciary Committee. The bill was amended in committee and reported out "Do Pass". Senate Journal, 45th Legislature, at 1517. On the floor of the Senate, the bill was substantially amended to its present form in RCW 10.94. Senate Journal, 45th Legislature, at 2204. The cited language in section 68 was not in the bill as passed by the Senate. Substitute House Bill 615 was referred again to the House which adopted the Senate amendments. House Journal, 45th Legislature, at 1765. The importance of this legislative activity was correctly stated by Justice Horowitz:

> The significance of this rejection should not be overlooked in ascertaining legislative intent. Consideration of the legislative history of an enactment has long been held to be a legitimate method of determining the legislature's intent. *Ropo, Inc. v. Seattle,* 67 Wn.2d 574, 409 P.2d 148 (1965); *State ex rel. Fair v. Hamilton,* 92 Wash. 347, 159 P. 379 (1916). The majority in *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 536 P.2d 157 (1975), acknowledged the value in appropriate circumstances of considering sequential drafts of a bill. *Hama Hama Co. v. Shorelines Hearings Bd., supra* at 450. Unlike the enactment considered in that case, RCW 10.94 is not "replete with inconsistencies, errors, and apparent oversights," and thus it is clear some insight can be gained from examining the death penalty statute's legislative history. It is presumed that members of the legislature were aware of the state of the law and of prior drafts of the bill at the time RCW 10.94 was enacted. *See State v. Fenter,* 89 Wn.2d 57, 569 P.2d 67 (1977); *State*

*ex rel. Fair v. Hamilton, supra* at 352; 2A C. Sands, *Sutherland's Statutes and Statutory Construction* § 48.04, at 197 (4th ed. 1973). It therefore is presumed that the legislature did not intend to allow a special sentencing procedure for infliction of the death penalty on a first degree murder defendant who pleads guilty. There is no evidence which overcomes this presumption.

*Martin,* at 19. While it may be contended the legislature eliminated section 68 because it was aware of the existence of RCW 10.49.010, there is nothing to suggest this was the case and if this was so it is reasonable to believe the legislature would have said so.

Furthermore, as has been observed many times, death as a punishment is different. When a defendant's life is at stake, the courts have been particularly sensitive to insure that every safeguard is observed. *Gregg v. Georgia,* 428 U.S. 153, 187, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). The connection between RCW 10.49.010 and RCW 10.94.020 is too tenuous to be used as a vehicle to condemn a defendant to death by execution. We reaffirm our position in *State v. Martin, supra,* that there is neither a "current statutory provision that authorizes the impaneling of a special jury to decide the death penalty issue when a capital defendant pleads guilty" (*Martin,* at 8) nor a "statutory means provided by which the death penalty can be imposed." *Martin,* at 9. RCW 10.49.010 fitted in with the scheme of previous homicide and death penalty statutes. *See State v. Baker,* 78 Wn.2d 327, 474 P.2d 254 (1970). It is not applicable to the present system.

█ The maximum penalty for a defendant who pleads guilty to first degree murder is life imprisonment without possibility of parole. A defendant who pleads not guilty and is subject to a jury trial may receive the death penalty. Where, pursuant to statutory procedure, the death penalty is imposed upon conviction following a plea of not guilty and a trial, but is not imposed when there is a plea of guilty, that statute is unconstitutional. *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209

(1968); *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980) (Horowitz, J., concurring). The Washington statutes for the imposition of the death penalty needlessly chill a defendant's constitutional rights to plead not guilty and demand a jury trial and violate due process. *United States v. Jackson, supra.* They do not meet the standards of the state or federal constitutions.

■ The State next contends that as a matter of policy it should be allowed to require a jury in capital cases. This may be a salutary policy but a request for its implementation must be directed to the legislature, not this court. We agree with the views of the United States Supreme Court in *United States v. Jackson, supra* at pages 584–85:

> It is true that a defendant has no constitutional right to insist that he be tried by a judge rather than a jury, *Singer* v. *United States,* 380 U. S. 24 [13 L. Ed. 2d 630, 85 S. Ct. 783 (1965)], and it is also true "that a criminal defendant has [no] absolute right to have his guilty plea accepted by the court." *Lynch* v. *Overholser,* 369 U. S. 705, 719 [8 L. Ed. 2d 211, 82 S. Ct. 1063 (1962)]. But the fact that jury waivers and guilty pleas may occasionally be rejected hardly implies that all defendants may be required to submit to a full–dress jury trial as a matter of course. Quite apart from the cruel impact of such a requirement upon those defendants who would greatly prefer not to contest their guilt, it is clear—as even the Government recognizes—that the automatic rejection of all guilty pleas "would rob the criminal process of much of its flexibility." As one federal court has observed:
>
> > "The power of a court to accept a plea of guilty is traditional and fundamental. Its existence is necessary for the . . . practical . . . administration of the criminal law. Consequently, it should require an unambiguous expression on the part of the Congress to withhold this authority in specified cases." [*United States* v. *Willis,* 75 F. Supp. 628, 630 (D.C. 1948).]

Finally, the State asserts that since the Texas and Washington statutes are similar, we should adopt the reasoning of the Texas courts in construing our statute. We reject this argument. The major similarity between the

Washington and Texas statutes and mentioned in the legislative debate (*see* House Journal, 42d Legislature (1971), at 1160) is the question to the jury as to the prediction of future dangerousness. See IV, *infra*. As to the Texas statutes which concern guilty pleas, the requirement of a jury trial in a capital case and the identity of the sentencing jury, we do not find the scheme of the Texas statute to be comparable to the complex, interrelated system of Washington.

█ We reaffirm our holding in *State v. Martin, supra,* that a defendant who pleads guilty cannot be subjected to the enhanced penalties for first degree murder under RCW 9A.32.040. We hold that the procedure for imposing the death penalty is unconstitutional for any defendant, either a defendant who pleads guilty or one who is found guilty by a jury. *United States v. Jackson, supra.*

II

The constitutional principle of *United States v. Jackson, supra,* is that if the severity of the punishment is dependent upon the way guilt is determined—*e.g.*, by a plea of guilty or by a jury trial—this imposes an impermissible burden on the exercise of constitutional rights. The question we must now consider is whether, although the death penalty may not be imposed, the State may still seek and have imposed in cases of aggravated first degree murder, the punishment of life imprisonment without the possibility of parole. We hold it may not.

Before turning to the constitutional argument, we note that in the event of a guilty plea the same hiatus exists in RCW 10.94 in the procedure for reconvening a jury for purposes of imposing a sentence of life without possibility of parole as there is for imposing the death penalty. All of the jury sentencing procedures, including life with possibility of parole, are predicated on the filing of a notice of intention to request the death penalty in accordance with RCW 10.94.010. Thus, if the death penalty scheme is

unconstitutional, as we hold it to be, the procedure for filing a notice of intention to seek the death penalty is obviated and the question of life imprisonment without possibility of parole may not be considered.

There are also constitutional reasons for striking the sentence of life imprisonment without possibility of parole. Although *United States v. Jackson, supra,* involved the death penalty, its rationale is not confined to the death penalty. The State, however, relying upon *Corbitt v. New Jersey,* 439 U.S. 212, 58 L. Ed. 2d 466, 99 S. Ct. 492 (1978), contends *Jackson* has no application.

In *Corbitt,* it was held that *Jackson* did not apply to the punishment scheme in New Jersey. Under the New Jersey homicide statutes, juries designated whether murder was in the first or second degree. The mandatory punishment for those convicted of first degree murder was life imprisonment; second degree murder carried a maximum sentence of 30 years. There was no death penalty. Trials to the court in murder cases were not permitted and guilty pleas were forbidden. However, pleas of non vult or nolo contendere were allowed. If accepted, the trial court had discretion to impose a life sentence or the second degree murder sentence without actually determining whether the murder was of the first or second degree. The Supreme Court stated the difference between *Jackson* and *Corbitt*:

> We agree with the New Jersey Supreme Court that there are substantial differences between this case and *Jackson,* and that *Jackson* does not require a reversal of Corbitt's conviction. The principal difference is that the pressures to forgo trial and to plead to the charge in this case are not what they were in *Jackson.* First, the death penalty, which is "unique in its severity and irrevocability," *Gregg* v. *Georgia,* 428 U. S. 153, 187 [49 L. Ed. 2d 859, 96 S. Ct. 2909] (1976), is not involved here. Although we need not agree with the New Jersey court that the *Jackson* rationale is limited to those cases where a plea avoids any possibility of the death penalty's being imposed, it is a material fact that under the New Jersey law the maximum penalty for murder is life imprisonment, not death. Furthermore, in *Jackson,* any risk of

suffering the maximum penalty could be avoided by pleading guilty. Here, although the punishment when a jury finds a defendant guilty of first–degree murder is life imprisonment, the risk of that punishment is not completely avoided by pleading *non vult* because the judge accepting the plea has the authority to impose a life term. New Jersey does not reserve the maximum punishment for murder for those who insist on a jury trial.

(Footnote omitted.) *Corbitt v. New Jersey, supra* at 217.

As is apparent from the New Jersey statute and its treatment by the Supreme Court, it was in effect a statute which encouraged plea bargaining. As was observed in *Corbitt v. New Jersey, supra* at pages 223–24:

Had Corbitt tendered a plea and had it been accepted and a term of years less than life imposed, this would simply have recognized the fact that there had been a plea and that in sentencing it is constitutionally permissible to take that fact into account. The States and the Federal Government are free to abolish guilty pleas and plea bargaining; but absent such action, as the Constitution has been construed in our cases, it is not forbidden to extend a proper degree of leniency in return for guilty pleas. New Jersey has done no more than that.

We discern no element of retaliation or vindictiveness against Corbitt for going to trial. There is no suggestion that he was subjected to unwarranted charges. Nor does this record indicate that he was being punished for exercising a constitutional right. Indeed, insofar as this record reveals, Corbitt may have tendered a plea and it was refused. There is no doubt that those homicide defendants who are willing to plead *non vult* may be treated more leniently than those who go to trial, but withholding the possibility of leniency from the latter cannot be equated with impermissible punishment as long as our cases sustaining plea bargaining remain undisturbed. Those cases, as we have said, unequivocally recognize the constitutional propriety of extending leniency in exchange for a plea of guilty and of not extending leniency to those who have not demonstrated those attributes on which leniency is based.

(Footnote omitted.)

In contrast to our statutory scheme, the New Jersey system allowed the judge to impose either the maximum or minimum sentence for murder upon the plea of non vult. Even though the facts may indicate second degree murder, the trial court on a plea of non vult might sentence a defendant to life imprisonment. Under RCW 10.94, *any* risk of the more severe penalty can be avoided by pleading guilty; the maximum penalty is reserved only for those who assert their right to a jury trial and plead not guilty.

In other jurisdictions where this issue has arisen and where the death penalty has not been involved, the courts have consistently found the legislation constitutionally defective. *See People v. C.,* 27 N.Y.2d 79, 261 N.E.2d 620, 313 N.Y.S.2d 695 (1970); *Veilleux v. Springer,* 131 Vt. 33, 300 A.2d 620 (1973); *State v. Hass,* 268 N.W.2d 456 (N.D. 1978); *State v. Nichols,* 247 N.W.2d 249 (Iowa 1976); *In re Lewallen,* 23 Cal. 3d 274, 590 P.2d 383, 152 Cal. Rptr. 528 (1979). A statute which exacts a penalty for demanding a jury trial is unconstitutional. *Commonwealth v. Bethea,* 474 Pa. 571, 379 A.2d 102 (1977). The State may not by statute offer "an individual a reward for waiving a fundamental constitutional right, or [impose] a harsher penalty for asserting it". *People v. C., supra* at 86. As the Supreme Court pointed out in *United States v. Jackson, supra* at page 583:

> For the evil in the federal statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them. A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right.

Even so, the State contends, a life sentence without a possibility of parole or release is not sufficiently different from life imprisonment with the possibility of parole and given the fact that parole is a matter of favor or grace to which the legislature may attach such conditions as it sees fit, the penalty is the same. *See In re George,* 90 Wn.2d 90,

579 P.2d 354 (1978); *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980).

It is apparent, however, that the legislature did not think the two penalties to be the same. Life imprisonment without possibility of parole or release is reserved only for those first degree murderers who the jury also finds to have committed an "aggravated" murder. The sentence of life without possibility of parole cannot be suspended, deferred, or commuted by any judicial officer. The Board of Prison Terms and Paroles cannot grant parole, reduce the period of confinement or release a defendant for good behavior. Temporary release or furlough programs are forbidden. RCW 9A.32.040(2). The reservation of these penalties, which are absolute, to those who plead not guilty is exactly that kind of burden which is forbidden by the constitution.

The legislature believed and we find the penalty of life imprisonment without hope of parole or release to be substantially different than life with the possibility of parole. This difference violates the principle enunciated in *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968).

We hold the State may not constitutionally seek life imprisonment without possibility of release or parole for those who are found guilty of aggravated first degree murder. The fact that RCW 10.94 contains a severability clause (RCW 10.94.900) is irrelevant if the portion remaining, as here, is still unconstitutional.

### III

Defendants contend the sentencing procedures in RCW 10.94.020 are constitutionally defective because the questions which the jury must answer in the sentencing procedure are in the nature of special questions to the jury and "infringe on [the jury's] power to deliberate free from legal fetters". *United States v. Ogull,* 149 F. Supp. 272, 276 (S.D.N.Y. 1957). The difficulty as seen by defendants is spelled out in *United States v. Spock,* 416 F.2d 165, 182 (1st Cir. 1969). It is

the subtle, and perhaps open, direct effect that answering special questions may have upon the jury's ultimate conclusion. There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step. A juror, wishing to acquit, may be formally catechized. By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.

Under RCW 10.94.020, the jury must be unanimously convinced beyond a reasonable doubt that (1) one or more statutory aggravating circumstances have been proven (RCW 10.94.020(7)); (2) there are not sufficient statutory or nonstatutory mitigating circumstances to merit leniency (RCW 10.94.020(8)); (3) the evidence presented at trial establishes the guilt of the defendant with clear certainty (RCW 10.94.020(10)(a)); and (4) there is a probability that the defendant would commit additional criminal acts of violence that would constitute a continuing threat to society (RCW 10.94.020(10)(b)).

Defendants not only raise objection to these questions, they also state there must be a general verdict rendered by the jury as to the sentence. It should be noted that the cases cited by the defendants involve jury verdicts as to guilt or innocence and not the sentencing procedure. Whatever may be the requirement in these cases, in a capital case the sentencing procedures contained in the Washington statutes are acceptable to the United States Supreme Court. The Texas death penalty procedure, like that in Washington, requires the jury to answer special questions but has no general verdict for sentencing. The Texas statute was upheld in *Jurek v. Texas,* 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976). In *Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976), there were special questions and a general verdict from the jury.

The Georgia statute was upheld. In discussing sentencing procedure, the *Gregg* court said:

> In summary, the concerns expressed in *Furman* [*Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)] that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

*Gregg v. Georgia, supra* at 195.

In *Lockett v. Ohio,* 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), the Supreme Court concluded that:

> [I]n all but the rarest kind of capital case, [the sentencer may] not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

(Footnotes omitted.) Pursuant to RCW 9A.32.045(2), the sentencing jury is not precluded from considering any mitigating factor: "In deciding whether there are mitigating circumstances sufficient to merit leniency, the jury may consider any relevant factors, including, but not limited to, the following:". Consequently, the Washington procedures both meet the requirements of *Gregg* and do not violate the strictures of *Lockett.*

So long as the statutes meet the requirements enunciated by the United States Supreme Court so that the death penalty is not imposed arbitrarily or capriciously and the sentencing authority is given adequate information and guidelines, a general verdict by the jury on sentencing is not required. We hold that under the statutory scheme for imposing the death penalty in this state a general verdict by the jury as to the sentence is not constitutionally

required, and that the questions asked do not infringe upon the prerogatives of the jury.

### IV

RCW 10.94.020(10)(b) reads:

Are you [the jury] convinced beyond a reasonable doubt that there is a probability that the defendant would commit additional criminal acts of violence that would constitute a continuing threat to society?

Defendants claim the question is so vague and the issue it presents so imponderable that it fails to provide a rational and fairly limited basis for the decision whether or not to impose the death penalty. We disagree and, contrary to the position of defendants, find that this question has been considered and answered by the United States Supreme Court in *Jurek v. Texas, supra.*

In *Jurek,* the Supreme Court reviewed a provision of the Texas death penalty statute which is identical to the question in RCW 10.94.020(10)(b). In discussing this provision of the Texas statute, the court, in an opinion signed by three Justices said:

Focusing on the second statutory question that Texas requires a jury to answer in considering whether to impose a death sentence, the petitioner argues that it is impossible to predict future behavior and that the question is so vague as to be meaningless. It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times

each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

(Footnotes omitted.) *Jurek v. Texas,* 428 U.S. 262, 274–76, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976).

Chief Justice Burger concurred in the judgment. Justice White, joined by the Chief Justice and Justice Rehnquist, concurred. The question before us was specifically reviewed by the concurring opinion of Justice White. Discussing the issue of vagueness, the concurrence stated:

Petitioner claims that the additional questions upon which the death sentence depends are so vague that in essence the jury possesses standardless sentencing power; but I agree with JUSTICES STEWART, POWELL, and STEVENS that the issues posed in the sentencing proceeding have a commonsense core of meaning and that criminal juries should be capable of understanding them.

*Jurek,* at 278–79. In essence, the Supreme Court upheld the Texas language on predicting future events because (1) prediction of future behavior has a common core of meaning juries can understand and (2) prediction of future behavior depends on the jury having sufficient information and under the Texas statute the jury would have before it "all possible relevant information about the individual defendant whose fate it must determine." *Jurek,* at 276. The Washington statute is clearly sufficient to meet this standard. RCW 10.94.020(7), (8), (10)(a), (b); RCW 9A.32-.045(2). Certainly the rationale and results of *Jurek* can be argued. *See, e.g.,* Black, *Due Process for Death: Jurek v. Texas and Companion Cases,* 26 Cath. U.L. Rev. 1 (1976). We believe, however, that the constitutional validity of the Texas statute which is identical to RCW 10.94.020(10)(b) has been considered by a majority of the Supreme Court and its constitutionality upheld. This same issue has come before the Texas Court of Criminal Appeals. *Collins v. State,* 548 S.W.2d 368 (Tex. Crim. App. 1976), *cert. denied,* 430 U.S. 959, 51 L. Ed. 2d 811, 97 S. Ct. 1611 (1977). In

*Collins,* the Texas court held the words "a probability" in the context of the statute are not unconstitutionally vague or overbroad.

Defendants next urge that the due process clause of the Washington Constitution, article 1, section 3, "No person shall be deprived of life, liberty, or property, without due process of law", may set a higher standard than the fourteenth amendment to the United States Constitution and should control. We have long held that federal cases construing the various due process clauses of the federal constitution should be given great weight but that they are not necessarily controlling in our construction of Const. art. 1, § 3. *Young v. Konz,* 91 Wn.2d 532, 588 P.2d 1360 (1979); *Herr v. Schwager,* 145 Wash. 101, 258 P. 1039 (1927).

We believe, however, that the prediction of future dangerousness while admittedly difficult is neither so vague nor imponderable as to be unconstitutional. Although the case concerned an attack on the commitment law for criminal insanity and the predictive language was "a substantial likelihood of repeating similar acts" rather than "a probability" certain criminal acts would be committed, we believe the analysis and holding by the court in *Alter v. Morris,* 85 Wn.2d 414, 536 P.2d 630 (1975), overruled on other grounds, *In re Harris,* 94 Wn.2d 430, 436, 617 P.2d 739 (1980), is applicable here. While, as we observed in *Alter* at page 420, "the social and scientific determinants of dangerousness, especially future dangerousness, are far from perfect", nonetheless we found the standard not to be unconstitutional:

> [T]he State's interest in the safety of its citizens is strong enough to allow the legislature some leeway in formulating what are essentially predictive standards. The theory of mental commitment underlying both statutes is twofold: preventive detention, and treatment. Neither statute authorizes commitment and detention on the sole ground of a person's need for treatment; protection of citizens is the primary justification for the deprivation of an individual's liberty under these statutes. Protection by

prevention requires prediction; under our statutes, prediction is based in part on the fact of prior dangerous acts proved beyond a reasonable doubt. Full due process safeguards surround that proof. The fact that the prediction cannot be foolproof does not discredit the attempt. At this point in the development of our knowledge about human behavior, the dangerousness standard is not an unreasonable one.

*Alter v. Morris, supra* at 420–21.

We hold RCW 10.94.020(10)(b) meets the standards of both the federal and the state constitutions.

## V

Defendants contend that execution by hanging (RCW 10.70.090) violates the eighth amendment to the United States Constitution and Const. art. 1, § 14. We emphasize again that the issue before us is not the constitutionality of the death penalty per se but only whether a particular method of executing the death penalty violates the constitution.

The State cites a number of cases upholding the constitutionality of hanging as a means of execution. These cases without exception are more than 50 years old, apply long discarded standards for determining cruel and unusual punishment (*State v. Burris,* 194 Iowa 628, 190 N.W. 38 (1922)), or simply fail to discuss any standards (*State v. Butchek,* 121 Ore. 141, 253 P. 367 (1927)). The 1951 Oregon case cited does not even discuss the constitutionality of death by hanging. *State v. Leland,* 190 Ore. 598, 227 P.2d 785 (1951). The State cites no modern authority which holds execution by hanging to be constitutional.

In *Weems v. United States,* 217 U.S. 349, 378, 54 L. Ed. 793, 30 S. Ct. 544 (1910), the Supreme Court observed that the concept of cruel and unusual punishment "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." Even before the rigors of the Eighth Amendment were applied to the states in *Robinson v. California,* 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962), the court recognized that

[t]he traditional humanity of modern Anglo–American law forbids the infliction of unnecessary pain in the execution of the death sentence. Prohibition against the wanton infliction of pain has come into our law from the Bill of Rights of 1688. The identical words appear in our Eighth Amendment. The Fourteenth would prohibit by its due process clause execution by a state in a cruel manner.

*Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463, 91 L. Ed. 422, 67 S. Ct. 374 (1947). The four dissenting Justices agreed:

Taking human life by unnecessarily cruel means shocks the most fundamental instincts of civilized man. It should not be possible under the constitutional procedure of a self–governing people. . . .

. . .
. . . The all–important consideration is that *the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself.*

(Italics ours.) *Resweber,* at 473–74.

More recently, the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 102–03, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976), stated:

It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. [Granucci, *Nor Cruel and Unusual Punishment Inflicted: The Original Meaning,* 57 Cal. L. Rev. 839 (1969)], at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See *Wilkerson* v. *Utah,* 99 U. S. 130, 136 [25 L. Ed. 345] (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . ."); *In re Kemmler,* 136 U. S. 436, 447 [34 L. Ed. 519, 10 S. Ct. 930, 933] (1890) ("Punishments are cruel when they involve torture or a lingering death . . .").
Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, *e.g., Gregg* v. *Georgia* [428 U.S. 153, 49

L. Ed. 2d 859, 96 S. Ct. 2909 (1976)], *supra,* at 171 (joint opinion); *Trop* v. *Dulles,* 356 U. S. 86, 100–101 [2 L. Ed. 2d 630, 78 S. Ct. 590, 597–98] (1958); *Weems* v. *United States,* 217 U. S. 349, 373 [54 L. Ed. 793, 30 S. Ct. 544, 551] (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .," *Jackson* v. *Bishop,* 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles, supra,* at 101; see also *Gregg* v. *Georgia, supra,* at 172–173 (joint opinion); *Weems* v. *United States, supra,* at 378, or which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra,* at 173 (joint opinion); see also *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 463 [91 L. Ed. 422, 67 S. Ct. 374, 376] (1947); *Wilkerson* v. *Utah, supra,* at 136.

(Footnote omitted.)

Although prior to 1900 hanging was the nearly universal form of execution, at the present time in the English speaking parts of the world, only four jurisdictions provide for execution by hanging: Washington, Delaware, Montana and South Africa. *See* Gardner, *Executions and Indignities: An Eighth Amendment Assessment of the Methods of Inflicting Capital Punishment,* 39 Ohio St. L.J. 96, 119 (1978); NAACP Legal Defense Fund, *Death Row U.S.A.* (June 30, 1980); *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (Brennan, J., concurring). These facts alone indicate execution by hanging can hardly be compatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 2 L. Ed. 2d 630, 78 S. Ct. 590 (1958).

A substantial amount of information has been presented by defendants in their offers of proof, authorized by this court in its order of December 4, 1979. While there is some dispute between the experts of the State and defendants as

to the pain and suddenness of a properly performed hanging, the testimony of defendants' experts is far more persuasive than that of the State. The State's factual presentation on the physiological effects of execution by hanging is contained in two brief affidavits by two pathologists, Drs. Charles P. Larson and Gale E. Wilson. Both conclude that hanging results in severance of the spinal cord and immediate unconsciousness, although Dr. Wilson qualifies "immediately unconscious" to mean "a matter of perhaps ten seconds." Although both physicians have impressive credentials and. many years' experience in forensic pathology, there is no claim or showing that either expert has participated in any research on judicial hanging. Nor does either cite *any* medical monographs or treatises in support of his conclusion. Dr. Larson has testified as an expert witness "several hundred times" in courts in Washington and elsewhere, but he does not say that he ever testified as an expert on what happens to the condemned person before death by hanging occurs. He witnessed three judicial hangings in 1945; as medical officer his duty was to pronounce the executed person dead. We are not told whether unconsciousness was instantaneous in any of those cases. There is no allegation that Dr. Wilson has ever witnessed an execution by hanging.

By contrast, the evidence presented by defendants is lengthy, detailed, and supported by persuasive scientific medical research. Our review of this evidence persuades us that in the great majority of cases death by hanging does involve slow, lingering death. Dr. Cornelius Rosse, chairman of the Department of Anatomy at the University of Washington School of Medicine, has reviewed the medical literature on the subject, and concludes that the common belief that death is instantaneous due to disruption of the spinal cord is incorrect in all but a very small fraction of cases. Where death is not instantaneous, its actual cause is probably strangulation or suffocation, a process that can take several minutes.

Dr. Phillip D. Swanson, Professor of Neurology and head of that department at the University of Washington, also researched the medical literature on the subject. Dr. Swanson has testified that even if the spinal cord is severed instantaneously, this does not necessarily cause unconsciousness, although the person may lapse into unconsciousness due to lack of oxygen. Again, death would be caused by suffocation or strangulation. Moreover, in cases of less than complete severance of the spinal cord, death could take considerably longer.

Dr. Harry D. Patton, Professor and Chairman of the Department of Physiology and Biophysics at the University of Washington School of Medicine, agrees with his colleagues that there is a considerable question that judicial hanging severs the spinal cord, and adds that the nature of the characteristic fracture caused by a judicial hanging might actually provide some protection to the spinal cord by decompression. Studies of remarkably similar lesions encountered in automobile accident victims who suffered forcible high–velocity dorsiflexion of the head on the spinal column (so–called "hangman's fracture") have shown that all of the subjects survived, suggesting that such lesions do not sever the spinal cord and indeed seem to produce surprisingly little neural damage. Dr. Patton explains:

> It seems logical to conclude that the true cause of death in judicial hanging is either strangulation due to tracheal occlusion or cerebral ischemia [compression of the arteries carrying blood to the brain] due to occlusion of the blood supply—or both.

Dr. Patton again emphasizes that even a clean severance of the spinal cord "does not per se cause loss of consciousness," and describes experiments where the isolated head of a cat is maintained in a conscious condition after the spinal cord has been severed. (He mentions parenthetically that such experiments are by common consent banned as inhumane in this country and that reputable scientific journals will not accept papers reporting such studies.)

Defendants have also submitted numerous eyewitness accounts of actual hangings. Clinton Duffy, onetime warden at San Quentin Prison, participated in 60 hangings. Here is a portion of his description of the first hanging at which he officiated:

> The executioner put the noose over the man's head with a knot under the left ear. . . . I gave the nod, OK, and he raised his hand and these men in the little room saw that and they cut the springs which sprung the trap. The man hit bottom and I observed that he was fighting by pulling on the straps, wheezing, whistling, trying to get air, and that blood was oozing through the black cap. I observed also that he urinated, defecated, and droppings fell to the floor, and the stench was terrible. I also saw witnesses pass out and have to be carried from the witness room. Some of them threw up. After a doctor had placed a stool in front of the man, he ripped his shirt open, put the stethoscope over his heart, and between eight and thirteen minutes later, the doctor pronounced the man dead by no heartbeat.

When the man was taken down and his black cap removed, Duffy testified he noticed that "big hunks of flesh were torn off" the side of his face where the noose had been, "his eyes were popped," his tongue was "swollen and hanging from his mouth" and he had turned purple.

Instances in which the victims of judicial hanging have not died instantaneously, but have suffered lingering and at times violent deaths are numerous in Washington history. Newspaper accounts of Washington executions during this century reveal that death in one case came as soon as 4 minutes, but in several cases death took 20 minutes or more. (As to the admissibility of these reports, *see* ER 803(16); ER 901(b)(8); *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir. 1961).

Dr. Clarence Schrag, Professor of Sociology at the University of Washington and former Director of Corrections for the Washington State Department of Institutions, described a hanging at Walla Walla:

> [T]he trap door was sprung. He fell through the trap door some feet, going out of my sight since I was standing

on the platform. He disappeared from my view; but when he hit the end of the rope he bounced so that his head and shoulders came back up above the floor of the platform, which was a surprise to me. He bounced several times.

He then again, contrary to what was shown in the films, engaged in gyrations. Though his ankles and wrists were bound together, there was a great deal of motion, torso twisting, which motion continued, as I recall, for perhaps five minutes; and then began to decline in frequency and amount.

After ten minutes or so I saw no further motion.

Schrag waited for what might have been a total of 20 minutes, but when he felt for the victim's pulse, he was startled by the fact that the tendons were contracted severely, and there was an irregular but strong pulse.

Grim as these accounts may be, the results can be described only as horrifying when the hanging is not properly performed. The May 10, 1910 edition of the Seattle Times described an execution in which it took the victim over 22 minutes to die because of alleged bungling by the executioner. The unfortunate man strangled to death as he pleaded pitifully with the attendants to take him up and spring the drop again. So conscious was he throughout his agony that he was able to unbuckle the straps that bound his arms and drop the straps to the ground.

A perhaps more shocking and repulsive miscalculation occurred in the execution of Grant Rio in 1951. Albert Rembolt, a former employee at the State Penitentiary at Walla Walla, witnessed the execution. He recalls that, because the rope was left too long, Rio had his neck cut badly and was partially decapitated when the trap door was opened. Nineteen minutes later Rio was pronounced dead.

The evidence is overwhelming that in the executions performed in Washington in this century death has not been instantaneous. These horror stories are not unique. Other states which earlier used hanging had the same experience. *See* N. Teeters, *Hang By The Neck* 173–81 (1967); defendants' offer of proof, item 11. Furthermore, it is conceded by

the State that a properly performed execution is an art and that considerable skill is involved. It is uncontested that there are no trained hangers at the Washington State Penitentiary, nor are the prison authorities aware of any in the United States.

The medical evidence demonstrates that judicial hanging, even when performed by a competent hanger, involves the infliction of unnecessary pain, lingering torture, and slow death. The State can therefore give no assurance that hangings performed in this state in the future will involve anything but lingering and painful deaths. Under the circumstances, we find it inescapable that execution by hanging is that kind of cruel, wanton and barbarous act which offends civilized standards of decency and cannot be held constitutional under the Eighth Amendment and Const. art. 1, § 14.

In summary then, we hold: (1) The present statutory scheme for imposing the death penalty is unconstitutional; (2) under these statutes, the State may not seek and have imposed in cases of aggravated first degree murder the punishment of life imprisonment without the possibility of parole; (3) the special sentencing proceeding for imposing the death penalty does not unconstitutionally withdraw from the jury the question of the appropriate sentence; (4) RCW 10.94.020(10)(b), which requires the jury to make a prediction as to the future dangerousness of the defendant is constitutional; and (5) death by hanging violates the Eighth Amendment and Const. art. 1, § 14.

BRACHTENBACH, C.J., concurs as to issues I, III, and IV.

WILLIAMS, J. (concurring specially)—I concur in the majority opinion by Justice Dolliver. Furthermore, as to the first issue, I agree with the reasons expressed in Justice Utter's opinion concurring in part, dissenting in part.

In addition, I feel compelled to register my concern over the views expressed in several of the concurring and dissenting opinions with regard to the issue whether death by

hanging constitutes cruel and unusual punishment under the eighth amendment to the United States Constitution and Const. art. 1, § 14. Justice Stafford's opinion concurring in part and dissenting in part appears to defer to the legislative judgment that hanging is a constitutional form of punishment in capital crimes. I am troubled by the implication that the legislature, rather than the courts, is the proper body not only to determine the nature of a punishment, but also to evaluate the constitutionality of that punishment.

As Justice Dolliver's majority opinion makes plain, the United States Supreme Court has held in numerous cases that courts have the responsibility of evaluating punishments claimed to violate the Eighth Amendment. *See, e.g., Coker v. Georgia,* 433 U.S. 584, 53 L. Ed. 2d 982, 97 S. Ct. 2861 (1977); majority opinion, at 491–92, and cases cited therein. In addition, several federal courts have recently emphasized the importance of the judiciary in assessing claims of constitutional violations. In an action challenging prison conditions, for example, one court has explained:

> Whatever rights one may lose at the prison gates, . . . the full protections of the eighth amendment most certainly remain in force. *The whole point of the amendment is to protect persons convicted of crimes.* Eighth amendment protections are not forfeited by one's prior acts. *Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary.* The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.

(Citations omitted. Italics mine.) *Spain v. Procunier,* 600 F.2d 189, 193–94 (9th Cir. 1979). *See also Williams v. Edwards,* 547 F.2d 1206, 1212 (5th Cir. 1977); *Newman v. Alabama,* 503 F.2d 1320, 1329 (5th Cir. 1974).

In a case involving a claim that the life sentence imposed under the habitual criminal statute, RCW 9.92.090, is unconstitutionally cruel, this court has recently stated:

[W]e must and do defer to the legislative decision to impose an enhanced penalty on recidivists. *State v. Lee,* 87 Wn.2d 932, 558 P.2d 236 (1976). Yet, legislative authority is ultimately circumscribed by the constitutional mandate forbidding cruel punishment. Our duty to determine whether a legislatively imposed penalty is constitutionally excessive is not one which we assume eagerly, but we do not shrink from our responsibility.

*State v. Fain,* 94 Wn.2d 387, 402, 617 P.2d 720 (1980).

The concurring and dissenting opinions of Justices Rosellini and Dore do not disagree that it is the duty of the courts to determine the constitutionality of a particular form of punishment. Rather, those opinions conclude that in circumstances where the evidence is subject to dispute, the legislature is the proper body to take testimony and weigh conflicting data. Rosellini, J., dissenting in part, at 512; Dore, J., dissenting and concurring, at 527–28.

It must be emphasized that the urgency and importance of these cases prompted this court to invite the parties, by order, to submit a factual record on the issue of death by hanging. I presume the order contemplated that the court would assess this evidence. Moreover, it is not a novel undertaking for this court to independently evaluate a factual record in deciding a case resting on a claim of cruel punishment under the Eight Amendment and Const. art. 1, § 14. A majority of this court did that very thing in *State v. Smith,* 93 Wn.2d 329, 333–35, 339–44, 610 P.2d 869 (1980) (holding that a possible 5–year sentence for felonious possession of marijuana does not constitute cruel and unusual punishment).

It is thus plain to me that courts have historically been charged with the responsibility to enunciate "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 2 L. Ed. 2d 630, 78 S. Ct. 590 (1958). See especially *Estelle v. Gamble,* 429 U.S. 97, 102–04 & n.8, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976). Indeed, our failure to perform this important duty would render meaningless the constitutional prohibition against cruel punishment. *Spain v. Procunier, supra.*

Moreover, we have undertaken in these cases and in prior cases to make a factual determination if necessary to decide a claim of cruel punishment. *State v. Smith, supra.* In light of the evidence of the consequences of hanging presented by the voluminous record on this issue, I am persuaded that execution by hanging clearly falls within the prohibition against cruel punishment embodied in the Eighth Amendment and Const. art. 1, § 14.

ROSELLINI, J. (dissenting in part)—I cannot agree with the majority's interpretation of the statutes which regulate imposition of the death penalty, nor with the conclusion that those statutes are unconstitutional.

Under RCW 10.94.010, the prosecutor is authorized to seek the death penalty wherever first degree murder is charged if he has reason to believe there are aggravating circumstances. If he so elects, a special sentencing proceeding shall be held if the defendant is found guilty of first degree murder. RCW 10.94.020(1). The judge shall reconvene the same jury which tried the case to determine the presence of aggravating and mitigating circumstances, and among the matters to be considered is the strength of the evidence of guilt at the trial. RCW 10.94.020(2). It should be apparent that the legislature intended that all first degree murder cases be tried to a jury. But the majority of this court has found a way to expunge that intent from the statute.

The problem is here because of this court's interpretation of the aggravated murder statute in *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980). If the error of that interpretation is recognized, the statutes are not invalid under *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). In fact, our statutes are precisely what the Supreme Court approved of in that case.

*Jackson* held that an act of Congress which permitted a defendant to escape the death penalty by pleading guilty chilled the right of an accused to demand a jury trial and was therefore unconstitutional.

However, the holding in *Jackson* was based on the fact that under federal law there was no provision requiring a jury trial in all capital cases, or authorizing the court to impanel a jury to decide the penalty.

> The Government would have us give the statute this strangely bifurcated meaning without the slightest indication that Congress contemplated any such scheme. Not a word in the legislative history so much as hints that a conviction on a plea of guilty or a conviction by a court sitting without a jury might be followed by a separate sentencing proceeding before a penalty jury. If the power to impanel such a jury had been recognized elsewhere in the federal system when Congress enacted the Federal Kidnaping Act, perhaps Congress' total silence on the subject could be viewed as a tacit incorporation of this sentencing practice into the new law. But the background against which Congress legislated was barren of any precedent for the sort of sentencing procedure we are told Congress impliedly authorized.

*Jackson,* at 578.

Our statutes provide for a jury trial to fix the degree of murder and the penalty.

The Supreme Court in *Jackson* approved the State of Washington's statutory scheme for the death penalty.

> The goal of limiting the death penalty to cases in which a jury recommends it is an entirely legitimate one. But that goal can be achieved without penalizing those defendants who plead not guilty and demand jury trial. In some States, for example, the choice between life imprisonment and capital punishment is left to a jury in *every* case—regardless of how the defendant's guilt has been determined.[23]
>
> [23]See, *e. g.,* Wash. Rev. Code §§ 9.48.030, 10.01.060, 10.49.010 (1956). Cf. Cal. Penal Code § 190.1 (Supp. 1966).

*Jackson,* at 582.

RCW 10.01.060 and 10.49.010 are still in effect. RCW 9.48.030 provided in pertinent part:

> Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the

jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided.

Laws of 1919, ch. 112, § 1, p. 274.

RCW 9.48.030 has been replaced by RCW 9A.32 and 10.94, which provide in detail for the process of jury determination.

The United States Supreme Court had no difficulty in construing RCW 10.01.060 and 10.49.010 to require a jury trial in all capital cases and to harmonize with the first degree murder statute. That harmony exists with respect to the present statutory scheme.

The majority today decides to adhere to *State v. Martin, supra,* where it held that there is no statutory provision for the imposition of the death penalty, or a life sentence without possibility of parole, upon one who pleads guilty to a charge of first degree murder. Taking this stand, it reaches the inescapable conclusion that RCW 9A.32 and 10.94 are unconstitutional. In the course of reaching this result, the court has ignored fundamental principles of statutory construction, and has undercut the legislature's prerogative in deciding what crimes there shall be and how they shall be punished.

The legislature, accepting the will of the people expressed in an initiative measure, has decreed that there shall be a crime of aggravated murder, and that the punishment shall be death. Mindful of the awesome finality of that punishment, the legislature has taken pains to provide a procedure designed to assure that only the most outrageous offenses, committed by the least redeemable persons, shall invoke the penalty. Nevertheless, the majority, while not finding that penalty itself unconstitutional, has construed the act to have an effect which I am certain was never intended, and so has rendered it invalid.

I disagree both for the reasons set forth in my dissent in *Martin,* which I will not repeat here, and for the additional reasons which follow.

There are at least three statutes which attest to a legislative purpose to require a jury trial in all capital cases. By some judicial sleight of hand, this court has managed to emasculate all of them. Both the state and federal constitutions guarantee the right of trial by jury. One would expect the courts to be diligent to uphold statutes which implement that right. It is difficult to escape the surmise that it is more distaste for the penalty authorized than dissatisfaction with the laws, which leads the majority to follow a different course here. I would assume that most sensitive people sympathize with that distaste, even if all do not share it. Still, it is not an appropriate consideration to guide the court in its search for the meaning of a statute.

It is for the legislative branch of a state or the federal government to determine, within state or federal constitutional limits, the kind of conduct which shall constitute a crime and the nature and extent of punishment which may be imposed therefor. 1 C. Torcia, *Wharton's Criminal Law* § 10 (14th ed. 1978); 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 16 (4th ed. 1957); *McInturf v. Horton,* 85 Wn.2d 704, 538 P.2d 499 (1975). While an ambiguous criminal statute should be strictly construed in favor of the accused (*State v. Whatcom County District Court,* 92 Wn.2d 35, 593 P.2d 546 (1979)), the objective of the court, as in studying all other legislation, is to ascertain the intent and, if it is within constitutional limits, to give it effect. 3 C. Sands, *Statutes and Statutory Construction* § 59.06 (4th ed. 1974); 1 C. Torcia, *Wharton's Criminal Law* § 12 (14th ed. 1978); 73 Am. Jur. 2d *Statutes* §§ 295–96 (1974). Where a statute is open to more than one interpretation, and one will render it invalid while the other would render it constitutional, the latter construction should prevail. *Woodson v. State,* 95 Wn.2d 257, 623 P.2d 683 (1980); *State v. Dixon,* 78 Wn.2d 796, 479 P.2d 931 (1971). Finally, statutes which are in pari materia should be read together.

*St. Peter v. Rhay,* 56 Wn.2d 297, 352 P.2d 806 (1960). They should be harmonized wherever possible and effect should be given to both. *Snohomish County PUD 1 v. Broadview Television Co.,* 91 Wn.2d 3, 586 P.2d 851 (1978); *State v. Wright,* 84 Wn.2d 645, 529 P.2d 453 (1974).

In *Martin,* and in the majority opinion here, we find scant attention paid to these controlling principles. The majority holding in *Martin* rested upon an arbitrary interpretation of CrR 4.2(a), a procedural rule.[1] The relationship between CrR 4.2(a) and statutes which affect the trial proceedings in capital cases was never explored. The rule itself can scarcely be viewed as having created a right to plead guilty. It is essentially a restatement of the statutes which it superseded (RCW 10.40.150, .160) insofar as it deals with guilty pleas. Those statutes, like the rule, did not purport to create substantive rights but rather designated the kind of pleas acceptable and the form of their entry.[2]

---

[1] Having announced that the court has created a right to plead guilty in all criminal cases, through the office of its procedural rules, the majority in *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980), went on to hold that "a criminal defendant has the right to plead guilty unhampered by a prosecuting attorney's opinions or desires." *Martin,* at 5. It based its holding on the fact that no statute or rule requires prosecutorial approval before a defendant may plead guilty. While this is true, it does not follow that, by pleading guilty, a defendant in a capital case may avoid a jury trial. This court has held to the contrary.

In *State v. Davis,* 6 Wn.2d 696, 704, 108 P.2d 641 (1940), the defendant, charged with first degree murder, had pleaded guilty and stood upon that plea, although his counsel interposed on his behalf a plea of not guilty by reason of insanity. This court cited Rem. Rev. Stat. § 2116 [Pierce's Code § 9169] (now RCW 10.49.010) and said:

In the case at bar, it was necessary that a trial be had, notwithstanding appellant's plea of guilty, in order that the degree of murder might be determined by a jury. Appellant had made a confession, and had pleaded guilty, but the state was bound by neither, nor limited in the method of proving its case.
(Citations omitted.)

That interpretation of the statute has never been rejected by the legislature nor disturbed by this court. Thus, it matters not whether the prosecutor can hamper a plea of guilty with his "opinions or desires." What is significant is that he has a statutory right to present to a jury his evidence concerning the degree of the crime and the punishment to be imposed.

[2] "There are but three pleas to the indictment or information. A plea of—
"(1) Guilty;

These statutes had been enacted in the Code of 1891, ch. 28, §§ 57, 58.

The rule or rules which supplanted these statutes, like the statutes themselves, must be read in conjunction with other modifying statutes. These include RCW 10.01.060 as amended by Laws of 1951, ch. 52, § 1, RCW 9A.32, 10.94, and 10.49.010.

It is astonishing to find the majority here at the same time approving *Martin* (where a procedural rule had been held to modify the death penalty statutes) and declaring that the statutory scheme embodied in RCW 9A.32 and 10.94 is so complete and autonomous that statutes in pari materia can be of no force and effect. I submit that if RCW 9A.32 and 10.94 are indeed intended to express the whole law upon the subject which they cover, then this court's rules are no more operative than are the statutes which are in pari materia, and there must be a trial in every capital case, regardless of the plea that is entered. The statutes make no provision for a conviction without a trial. To give effect to all their requirements, there must be a jury trial in every case where the prosecutor requests a death penalty proceeding. If this is the statutory requirement, then the constitutional objection which invalidated the death penalty provision in *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968), is not present here.

---

"(2) Not guilty;

"(3) A former judgment of conviction or acquittal of the offense charged, which may be pleaded with or without the plea of not guilty." RCW 10.40.150.

"The plea may be entered on the record substantially in the following form:

"(1) A plea of guilty: The defendant pleads that he is guilty of the offense charged in the indictment (or information as the case may be);

"(2) A plea of not guilty: The defendant pleads that he is not guilty of the offense charged in the indictment (or information as the case may be);

"(3) A plea of former conviction or acquittal: The defendant pleads that he has formerly been convicted (or acquitted as the case may be) of the offense charged in the indictment (or information as the case may be), by the judgment of the court of (naming it), rendered on the _____ day of ___ A.D. 19_ (naming the time)." RCW 10.40.160.

*See also* RCW 10.40.170, providing:

"The plea of guilty can only be put in by the defendant himself in open court."

But if, as the court held in *Martin,* it must look beyond RCW 9A.32 and 10.94 to find the legislative intent, the logical place to turn is to other statutes dealing with the same subject.

How were these statutes treated in *Martin?* First, the majority disposed of RCW 10.01.060. That section provides:

> No person informed against or indicted for a crime shall be convicted thereof, unless by admitting the truth of the charge in his plea, by confession in open court, or by the verdict of a jury, accepted and recorded by the court: *Provided however,* That except in capital cases, where the person informed against or indicted for a crime is represented by counsel, such person may, with the assent of the court, waive trial by jury and submit to trial by the court.

The opinion declares that the proviso has been interpreted as denying to an accused in a capital case the option of waiving a jury trial and submitting to a trial by the court. I submit that the interpretation has been much broader than that. The court cited *State v. Baker,* 78 Wn.2d 327, 474 P.2d 254 (1970). The issue there was whether the accused had a constitutional right to submit to a trial by the court. In rejecting that contention, we said:

> There is no question but that RCW 9.48.030, RCW 10.01.060, and RCW 10.49.010 require trial by jury when a person is charged with murder in the first degree.

*Baker,* at 334.

*Brandon v. Webb,* 23 Wn.2d 155, 160 P.2d 529 (1945), the remaining case cited by the majority in *Martin,* contains no mention of RCW 10.01.060 and its interpretation was not at issue there.

The majority in *Martin* refused to find in the act any intimation of a legislative intent that all capital cases should be tried to a jury. This is exactly opposite to the view which this court took in *State v. Boggs,* 80 Wn.2d 427, 428 n.1, 495 P.2d 321 (1972). There it said the language revealed an unquestionable intent to require a jury trial. The court was construing the section in pari materia with another act—the death penalty provision. RCW 9.48.030;

Laws of 1919, ch. 112, § 1. That provision occupied only one section of the penal law—in striking contrast to the statutes which have replaced it. But there is nevertheless a vital similarity in language. Neither expressly denies a right to plead guilty; but both refer to the "trial" and require "the jury" to participate in the penalty determination. Thus, under both the old and the new statutes, the necessity of a jury trial is implied rather than expressed. And yet this court in *Boggs* and *Martin* construed essentially the same language in exactly opposite ways.

If there is any ambiguity in RCW 10.01.060, all doubt should be removed by a reading of RCW 10.49.010. That section provides:

> If, on the arraignment of any person, he shall plead guilty, if the offense charged be not murder, the court shall, in their discretion, hear testimony, and determine the amount and kind of punishment to be inflicted; but if the defendant plead guilty to a charge of murder, a jury shall be impaneled to hear testimony, and determine the degree of murder and the punishment therefor.

This section so clearly requires a jury trial in all first degree murder cases, to determine the degree of crime as well as the punishment, that the court's former holdings upon the subject would appear unassailable. Faced with this seemingly impregnable obstacle to the pursuit of its course of reasoning, the majority in *Martin* disposed of it by speaking of the statute in the past tense, as though everyone knew it had long since expired. The majority here assumes that the legislature has repealed it *sub silentio*.

Contrary to that supposition, RCW 10.49.010 is not a defunct statute. The legislature has not expressly repealed it, and if RCW 10.94 has worked an implied repeal, it is only a partial one. The court rules can be easily harmonized with it; and were there a necessary conflict, I submit that there is enough of substantive law embodied in the statute to make it predominate over any conflicting rule. It embodies an expression of public policy with respect to the imposition of the death penalty, and that is a matter within the

legislative domain exclusively. *See State v. Smith,* 84
Wn.2d 498, 527 P.2d 674 (1974).

The statute has withstood constitutional attacks. *State v.
Baker, supra; State v. Music,* 79 Wn.2d 699, 489 P.2d 159
(1971) (*vacated in part on other grounds and remanded,*
408 U.S. 940, 33 L. Ed. 2d 764, 92 S. Ct. 2877 (1972)).

In *In re Horner,* 19 Wn.2d 51, 141 P.2d 151 (1943), this
court held that, under this statute, an accused cannot waive
a jury, and a superior court is without power to enter judg-
ment and sentence unless and until a jury determines the
degree of crime.

If these two statutes are read in conjunction with RCW
10.94, with which they are in pari materia, it will be readily
seen that in every first degree murder prosecution there is
indeed a jury which "tried the case", and this is the jury
which the legislature declared should be reconvened to try
the question of punishment, under RCW 10.94.020.

The majority recites episodes from the legislative history
of RCW 10.94, from which it infers that the legislature did
not intend to authorize a special sentencing procedure
where there is a plea of guilty. If the theory of the majority
is correct, the legislature consciously and deliberately
enacted a statute designed to be unconstitutional. As I
pointed out in my dissent to *Martin,* the fact that the act
as passed contained no reference to a guilty plea is consis-
tent with a legislative intent that there should be no avoid-
ance of trial by the entry of a plea of guilty. The history is
equivocal, at best. The court is well advised to look to the
language of the statutes and the principles of construction
to find the legislative intent, rather than to try to extract it
from the spotty and ambiguous course of proposed enact-
ments.

In another exercise in ingenious reasoning, the majority,
while making the proper assumption that the legislature
was aware of the existence of other statutes affecting the
trial of capital cases, concludes that it would have expressly
adopted those statutes if it had intended them to apply. I

am aware of no rule of statutory construction which supposes that the legislature intends to repeal by implication all harmonious statutes in effect at the time of an enactment. The rule is to the contrary, and the presumption should be that the legislature would have repealed these statutes, or expressly made them inapplicable to the present legislation, if that had been its intent.

Now it may be suggested that RCW 10.49.010 is not entirely compatible with RCW 10.94.020, because, under the former, the jury determines the punishment, while under the latter it only finds the facts upon which the sentence is entered pursuant to law. This is a difference more of form than of substance, but assuming the two cannot be harmonized, the earlier statute has been superseded only to the extent that there is an inconsistency. *Airway Heights v. Schroeder,* 53 Wn.2d 625, 335 P.2d 578 (1959); 1 J. Sutherland, *Statutes and Statutory Construction* § 2022 (3d ed. 1943). The remaining portion of the statute, requiring a jury trial to determine the degree of murder, taken together with the other statutes, constitute a complete and workable statutory scheme, in accord with the intent which is manifest in RCW 10.94 when read as a whole—namely, the intent that there should be a jury in all capital cases, and that the jury should find the facts which control the punishment.

Do this court's rules disrupt that scheme? I submit that they do not.

RCW 9.48.030, RCW 10.01.060, and RCW 10.49.010 were all in effect on April 18, 1973, when CrR 4.2 (designating the permissible pleas in criminal cases) and CrR 6.1(a) (providing that waivers of jury trials must be in writing) were adopted. Neither the Washington State Judicial Council Criminal Rules Task Force which proposed these rules nor this court itself ever suggested that they superseded any of these statutes, all regulating the imposition of the death penalty. In fact, CrR 6.1(b)(1), authorizing defendants in *noncapital* cases to accept a jury of less than

12, was adopted with obvious reference to these statutes, all requiring a jury trial in capital cases.

We have generally adhered to the principle that proceedings which are created by statute are to be governed by that statute. *State v. Womack,* 82 Wn.2d 382, 510 P.2d 1133 (1973); *In re Adoption of Parsons,* 76 Wn.2d 437, 457 P.2d 544 (1969); *Passmore v. Passmore,* 57 Wn.2d 762, 359 P.2d 811 (1961). This does not mean, of course, that the court's rules play no part in such a proceeding. It does mean that if they conflict with the statutory scheme, they must give way, else the statutory purpose may be frustrated, as is the case here. But it is not necessary to reach the question of conflict.

I submit that this court's rules are in no wise inconsistent with a statutory requirement that there be a jury in all capital cases.

CrR 4.2 lays down a general rule that a criminal defendant may plead not guilty, not guilty by reason of insanity, or guilty. This is a delineation of the range of permissible pleas. It does not purport to limit the legislature's power to mandate a jury trial for certain crimes, where it deems such trial to be in the interest of the public and the defendant.

CrR 6.1(a), if read literally, would appear to authorize jury waiver in all cases, regardless of legislative expressions upon the subject. If so, it cannot be reconciled with CrR 6.1(b)(1). But if the background of that rule is examined, it will be seen that it was intended to protect the constitutional right to a jury trial in all criminal cases (save those involving petty offenses), and not to confer an affirmative right to avoid such trials, regardless of legislative provision.

The Task Force which recommended adoption of this rule made this comment:

> This section has no direct source in present Washington law. It establishes the general right to a jury trial. Such right exists and continues to exist unless the defendant waives it in writing. The rule is written so as to guard against the silent waiver of a jury trial by failing to demand a jury as [in] civil cases. This section reflects

the Task Force's feeling that Criminal cases should be tried by a jury as a general rule, and that in order to avoid that procedure, the defendant must make an overt action to waive the jury, or lessen its size.

Criminal Rules Task Force, *Washington Proposed Rules of Criminal Procedure,* Comment to rule § 6.1(a), at 116 (1971).

This comment again reveals the Task Force's understanding of that which should be obvious to all—that the rule is meant to be one of general application and not to control where specific laws provide otherwise.

Since this court's procedural rules have the effect of law, being expressly authorized by the legislature, they should be construed as other laws are construed. The object should be to harmonize them with relevant statutes, so that legislative purposes may be achieved, rather than to use them as implements for nullifying otherwise valid substantive laws.

The general rule is that where general and special laws are concurrent, the special law applies to the subject matter contemplated by it to the exclusion of the general law. Furthermore, the subsequent enactment of a statute which treats a phase of the same general subject in a more minute way consequently repeals pro tanto the provisions of the general statute with which it conflicts. *Airway Heights v. Schroeder, supra. Accord, State v. Walls,* 81 Wn.2d 618, 503 P.2d 1068 (1972).

Under both of these phases of the rule, RCW 9A.32, RCW 10.01.060, RCW 10.49.010, and RCW 10.94, being special statutes, control the question of the necessity of a jury trial, prevailing over the court's rules, which are general in nature.

Thus, the rules of this court, when reasonably construed, offer no obstacle to the achievement of the legislative intent. That intent—to require a jury trial in all capital cases—implements the defendant's constitutional right to a jury trial and is in harmony with and facilitated by other statutes which are in pari materia. If effect is given to their manifest intent, the statutes are constitutional. If that

intent is ignored and a different intent is substituted, they cannot stand. The relevant principles of statutory construction direct the court to a construction of the statutes which render them constitutional. I would overrule *State v. Martin*, 94 Wn.2d 1, 614 P.2d 164 (1980), and hold that a person charged with a capital offense may not, by pleading guilty, avoid a jury trial.

I agree with the majority in its conclusion that the submitting of questions to the jury in the sentencing procedure, pursuant to RCW 10.94.020, does not unconstitutionally infringe upon the jury's power to "'deliberate free from legal fetters'". The statute was designed to and does in fact conform to the standards set by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976).

I also agree with the majority's disposition of the contention regarding the predictability of future conduct. The sufficiency of the evidence to support the jury's findings can be examined by the court wherever the question arises in individual cases. It would be inappropriate to make a conclusive and abstract judgment upon the matter at this time.

Upon the question whether hanging is a constitutional means of execution, I do not find before the court sufficient undisputed evidence to warrant a conclusion that this procedure is excessively cruel. Any means of inflicting death embodies cruelty. But there is medical evidence in the record that hanging almost invariably produces immediate death or at least loss of consciousness. There are exceptions, but this appears to be the case, whatever the means chosen. It is for the legislature, as the prescriber of the punishment for crime, to determine what method shall be used, in the absence of a definitive showing that unnecessary cruelty is involved. There is no such showing here.

DORE, J., concurs with ROSELLINI, J.

STAFFORD, J. (concurring in part, dissenting in part)—I am compelled to agree with the majority that the death

penalty statute, as it now reads, is unconstitutional under *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). *State v. Martin*, 94 Wn.2d 1, 614 P.2d 164 (1980), is correct both for the reasons stated therein and because, as Justice Utter persuasively points out, article 2, section 37 of our state constitution prohibits the legislature from attempting to amend RCW 10.49.010 by RCW 10.94.020. That such an amendment was attempted is implicit from Justice Rosellini's dissent wherein it is suggested the two statutes should be read together to make one scheme. Such is a constitutional impossibility. It is precisely the situation sought to be prevented by the framers of our constitution.

As to the second issue, I agree with Justice Dimmick. The differences between life imprisonment with or without possibility of parole are not sufficiently great to be an impermissible encouragement of a defendant to plead guilty. Thus, this situation falls within the framework of *Corbitt v. New Jersey*, 439 U.S. 212, 58 L. Ed. 2d 466, 99 S. Ct. 492 (1978). I also see no impediment to prosecutors using the special sentencing procedure of RCW 10.94 to file a notice of intention to seek life imprisonment without possibility of parole, given the clear manifestation of legislative intent in both RCW 10.94.900 (severability) and RCW 9A.32.047 (penalty shall be life imprisonment without possibility of release or parole if death penalty is held unconstitutional).

Regarding the third and fourth issues, I agree with Justice Dolliver's majority opinion.

As to the fifth issue, I must dissent. Although I personally find the thought of death by hanging to be abhorrent, and would prefer the employment of a more speedy and more reliable method, I cannot for that subjective reason alone hold it unconstitutional. A law should not be declared unconstitutional just because one does not like it. It is only when a statute contravenes a constitutional provision or principle that it must be invalidated.

The majority says hanging is cruel and unusual punishment because it offends civilized standards of decency. This is a purely subjective reaction, however. The legislature is mentally and morally as attuned as the members of this court to precisely determine the point at which civilization is in the "evolving standard of decency" or where such a punishment fits in. In a case such as this wherein wholly subjective observations and reasoning are involved, we should defer to the legislature's judgment. The legislature is, after all, the body most closely representative of the people whose standards of decency are said to be impacted. I cannot presume that the members of that body are less "decent" or "civilized" or any less capable of determining the community's "evolving standard of decency" than are the members of this court or the general populace.

Without question there are methods of imposing death that would clearly contravene the Eighth Amendment and Const. art. 1, § 14. We are not within such a clearly defined area, however. Rather, we are in a gray zone the bounds of which cannot be adequately defined by resort to the mere subjective standard that the method "offends civilized standards of decency" or offends "evolving standards of decency". While subjective standards may suffice to meet a clear–cut case, one must resort to a more objective approach to resolve the emotional issue before us. Absent some objective criteria there will be as many answers as there are people with differing moral and intellectual philosophies. Such a nebulous approach, with the possibility of uncertain results, is intolerable no matter which moral or philosophical view one may advocate. The majority has not employed the necessary objectivity.

BRACHTENBACH, C.J., concurs with STAFFORD, J.

HICKS and DIMMICK, JJ., concur with STAFFORD, J., as to issue V.

UTTER, J. (concurring in part, dissenting in part)—I agree with the majority except as to issue IV. On that issue

I believe RCW 10.94.020(10)(b) violates the due process guaranties of *both* the United States and Washington Constitutions.

## I

To be consistent with due process, a penal statute must contain ascertainable standards, so that people of reasonable understanding, when acting as jurors, will not be required to guess at the meaning of the enactment. *Seattle v. Drew,* 70 Wn.2d 405, 408, 423 P.2d 522, 25 A.L.R.3d 827 (1967). For criminal statutes to be constitutional, explicit standards are necessary to guard against arbitrary enforcement of the law. *Papachristou v. Jacksonville,* 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972). In capital sentencing, the need to guard against arbitrariness is even greater than in other criminal contexts, and the constitutional requirements are more stringent. *Godfrey v. Georgia,* 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). The sentencing statute must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" (Footnotes omitted.) *Godfrey,* at 428.

RCW 10.94.020(10)(b) violates the constitutional requirement of certainty and clarity. The inadequacy of its terminology has been empirically shown by the frequency with which deliberating juries have requested additional instructions on the terms "probability" and "criminal acts of violence." Scofield, *Due Process in the United States Supreme Court and the Death of the Texas Capital Murder Statute,* 8 Am. J. Crim. L. 1, 31 (1980). The statute is obscure in that the jury is required to find "a probability beyond a reasonable doubt." As ably discussed by two Justices in *Jurek v. State,* 522 S.W.2d 934, 945 (Tex. Crim. 1975), *aff'd, Jurek v. Texas,* 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976):

> What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a

"probability" that he will perform certain acts in the future? Did it mean, as the words read, is there *a* probability, some probability, any probability? We may say there is a twenty percent probability that it will rain tomorrow, or a ten or five percent probability. Though this be a small probability, yet it is some probability, *a* probability, and no one would say it is no probability or not a probability. It has been written: "It is probable that many things will happen contrary to probability," and "A thousand probabilities do not make one fact." The statute does not require a particular degree of probability but only directs that *some* probability need be found. The absence of a specification as to what degree of probability is required is itself a vagueness inherent in the term as used in this issue. Our common sense understanding of the term leaves the statute too vague to pass constitutional muster.

(Footnotes omitted.) Furthermore,

The concept of the existence of a "probability" "beyond a reasonable doubt" is and can be only puzzling—even mind–boggling—to a jury or to anybody. In strict mathematical terms, and in dealing with a subject strictly amenable to mathematical treatment, it is of course possible to assert that there "is a probability" not only "beyond a reasonable doubt" but to a certainty. But non–mathematicians neither use language nor think in such a way. The terms "probability" and "beyond a reasonable doubt" are repugnant and at war with one another in the common speech in which juries, like all of us, talk and think.

Black, *Due Process of Death: Jurek v. Texas and Companion Cases,* 26 Cath. U.L. Rev. 1, 4 (1976).

Additionally, the evidence indicates the unreliability of predicting future dangerousness. The research in this field shows that the ability to predict future violence is unproven. Scofield, *supra* at 32–41. The evidence in this case shows that no one can predict future violent behavior with more than 35 percent accuracy. Most experts agree there is a "very strong doubt" about the predictability of whether a person is more likely than not to commit an act of violence. A state parole board expert testified that pre-

dicting violent criminal behavior constitutes "sheer speculation." As a result, when a jury is asked to predict the possibility of future violent behavior, its decision is more likely to be influenced by the nature of the crime than the likelihood of future violence.

To conclude that RCW 10.94.020(10)(b) violates due process is not inconsistent with *Jurek* or *Alter v. Morris,* 85 Wn.2d 414, 536 P.2d 630 (1975), overruled on other grounds, *In re Harris,* 94 Wn.2d 430, 617 P.2d 739 (1980). *Jurek* holds only that a statute like ours does not violate the Eighth Amendment. In *Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 849, 96 S. Ct. 2909 (1976), where review was granted on the same issue as *Jurek* (423 U.S. 1082), the plurality opinion states that the writ of certiorari was limited to whether the death sentence in *Gregg* constituted cruel and unusual punishment. *Gregg,* at 162, 201 n.51; *see also Proffitt v. Florida,* 428 U.S. 242, 254 n.11, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976). Recognizing this, the California Court of Appeals held as unconstitutionally vague a California statute modeled after the one upheld in *Proffitt.* It held that vagueness, as measured by due process standards, had not been considered by the Supreme Court. *People v. Superior Court,* 105 Cal. App. 3d 365, 164 Cal. Rptr. 210, *cert. granted, judgment vacated,* 449 U.S. 945, 66 L. Ed. 2d 209, 101 S. Ct. 344 (1980) (judgment vacated and case remanded to determine whether California result was based on federal or state law).

*Alter* does not control the outcome of this case. In *Alter,* the controlling language was "a substantial likelihood of repeating similar acts." That is significantly less vague than "a probability beyond a reasonable doubt"—for it conveys a quantitative notion absent in the latter. Also, the court in *Alter* noted that the nature of mental commitments requires "some leeway in formulating what are essentially predictive standards." *Alter,* at 421. Leeway is permissible there because mental commitment may also further the best interest of the committed. *Alter v. Morris, supra;*

*Addington v. Texas,* 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979). That feature, and thus that justification for some imprecision in the standard, is absent from the death penalty adjudication. The capital murder defendant is not going to receive any treatment—the adjudication is not in his or her best interest. Furthermore, as already noted, the severity of the death penalty requires the utmost solicitude for reliability.

Lastly, neither *Jurek* nor *Alter* considers our state due process guaranty. That provision has a vitality independent of its federal counterpart, and can be more protective when the evidence and reasoning suggest that such is necessary. *See Olympic Forest Prods., Inc. v. Chaussee Corp.,* 82 Wn.2d 418, 511 P.2d 1002 (1973); *Young v. Konz,* 91 Wn.2d 532, 546, 588 P.2d 1360 (1979) (Utter, J., dissenting). Because the nearly uncontroverted evidence in this case indicates that the legislative standard requires nothing more than sheer speculation, RCW 10.94.020(10)(b) is violative of this state's due process clause. Consequently, the unreliability of the factual finding required by RCW 10.94-.020(10)(b), as well as its vagueness, violates the due process guaranties of *both* the United States and Washington Constitutions.

## II

The dissent on its face appears convincing, but, in addition to the reasons already given by the majority, the dissent overlooks two important points. First, death constitutes such a severe penalty that the usual rules of statutory construction cannot be given their usual application. *Cf. Woodson v. North Carolina,* 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). If there is any ambiguity in a death sentencing scheme, as is present here, it must be resolved in the defendant's favor.

The dissent also ignores Washington Const. art. 2, § 37, which prevents RCW 10.94.020 and 10.49.010 from being read in pari materia.

Washington Const. art. 2, § 37, requires that any act revising or amending another must set forth the revised or amended sections in full. The new statute must either be complete in itself or indicate how it relates to the statute it amends. *Washington Educ. Ass'n v. State,* 93 Wn.2d 37, 39, 604 P.2d 950 (1980). This ensures, among other things, that the legislature is aware of the full effect of each legislative enactment. *Flanders v. Morris,* 88 Wn.2d 183, 558 P.2d 769 (1977).

Although RCW 10.94.020 does not by its terms purport to amend RCW 10.49.010, an act may be amendatory, though not an amendment on its face. *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 24, 211 P.2d 651 (1949). An act is amendatory when it either alters the scope and effect of an existing statute, or cannot be implemented without referring to another enactment. *Washington Educ. Ass'n, supra; Weyerhaeuser Co. v. King County,* 91 Wn.2d 721, 592 P.2d 1108 (1979); *State ex rel. Arnold v. Mitchell,* 55 Wash. 513, 518, 104 P. 791 (1909).

By arguing that RCW 10.94.020 and 10.49.010 should be read in pari materia, the dissent is conceding that the two are interdependent and cannot exist without the other. However, since RCW 10.94.020 does not refer to RCW 10.49.010, reading the two together would violate Const. art. 2, § 37. Therefore, as appealing as the dissent may be, our state and federal constitutions prevent me from accepting it.

BRACHTENBACH, C.J.—I concur with Utter, J.'s, reasoning appearing under issue II herein in support of opinion by Dolliver, J., on issue I. I do not concur with Utter, J., on issue IV.

DORE, J. (concurring in part, dissenting in part)—

## I

As a preliminary matter, I find nothing ambiguous about RCW 10.94.010, 10.94.020, 10.94.030, 10.94.900, 9A.32.040, 9A.32.045, 9A.32.046, and 9A.32.047 which comprise the

1977 amendatory act in question. When a statute is unambiguous, there is no room for judicial interpretation. *Automobile Drivers Local 882 v. Department of Retirement Sys.*, 92 Wn.2d 415, 598 P.2d 379 (1979). The above cited sections create a procedure for sentencing a defendant who has been convicted of murder. I find nothing unclear in the procedure, nor do I find conflict with other Washington statutes.

The sentencing procedure has no impact on the defendant's plea. If defendant is found guilty of murder by a jury, the sentencing procedure is activated and the trial judge "shall reconvene the same trial jury". RCW 10.94.020(2). If conviction is based on a plea of guilty, the jury is impaneled by authority of RCW 10.49.010 which provides, in part:

> If, on the arraignment of any person . . . the defendant plead guilty to a charge of murder, a jury shall be impaneled to hear testimony, and determine the degree of murder and the punishment therefor.

Thereafter, that jury follows the special sentencing procedure as set forth in RCW 10.94.020(1)–(10) to "determine the degree of murder and the punishment therefor."

Statutes in pari materia are to be harmonized, where possible. 73 Am. Jur. 2d *Statutes* § 187, at 386–87 (1974). Clearly, RCW 10.94.020 and RCW 10.49.010 deal with the same subject (*i.e.*, they are in pari materia) and they can be read consistently with each other. The majority now creates a new rule: "If the legislature had meant RCW 10.49.010 and RCW 10.94.020(1) and (2) to be read together when a defendant pleaded guilty, it is unreasonable to believe it would have failed to say so." Majority opinion, at 475. Is it not more reasonable to assume that the legislature was aware of the familiar rule of construction that two statutes which are not in conflict are both to be given meaning and effect? The legislature is assumed to have had RCW 10.49-.010 in mind when it enacted RCW 10.94.020; the court must view the latter statute as if the legislature had considered its prior enactments. *McFadden v. Elma Country Club*, 26 Wn. App. 195, 613 P.2d 146 (1980).

## II

I turn now to the business of statutory construction. The primary role of the court which construes a statute is to determine the intent of the legislature, and to give effect to that intent. *Burlington N., Inc. v. Johnston,* 89 Wn.2d 321, 572 P.2d 1085 (1977). To this end, the statute must be read as a whole; intent is not to be determined by a single sentence (or, in this case, the single phrase "reconvene the same jury"). *State v. Fenter,* 89 Wn.2d 57, 569 P.2d 67 (1977).

Who could argue but that the legislature intended to provide for capital punishment for those who perpetrate the most heinous crimes? The majority apparently feels that the legislature intended to extend the death penalty only to those who were foolish enough not to plead guilty to aggravated murder.

When the legislative history of the statute is investigated, it becomes clear that the majority's holding is grounded on a fiction.

### 1. House Bill 615 (HB 615)

The present death penalty scheme originated as House Bill 615, 45th Legislature (1977) (HB 615). It was introduced by title only. The House Journal, 45th Legislature (1977) (House Journal), at 209 introduces "AN ACT Relating to crimes and criminal procedures" and lists those sections of Revised Code of Washington which are to be amended by the new act. There is absolutely nothing in the House Journal which indicates any of the substantive provisions of HB 615. Not a single legislator ever voted for or against HB 615.

### 2. Substitute House Bill 615 (SHB 615)

The judiciary committee substituted another bill for HB 615, designated in the House Journal at page 969 as Substitute House Bill 615 (SHB 615). The House Judiciary Committee recommended that Substitute House Bill 615 "Do Pass".

### 3. Engrossed Substitute House Bill 615 (ESHB 615)

Subsequently, discussions, points of inquiry, and changes were made to SHB 615. Those amendments were engrossed onto SHB 615 and the engrossed bill passed in the House and was sent to the Senate.

### 4. Senate Amendments to Engrossed Substitute House Bill 615

The Senate referred the engrossed bill to the judiciary committee. Certain amendments were considered by the Senate, as reflected in the Senate Journal, 45th Legislature (1977) (Senate Journal). The most dramatic change made, however, was the motion to "Strike everything after the enacting clause [of Engrossed SHB 615] and insert the following". At this juncture, a comprehensive Senate amendment comprising the Senate's death penalty scheme was attached onto the House's engrossed bill (No. 615); Senate Journal, at 1984. The House bill was dead. The Senate "amendments" passed in that chamber, and subsequently in the House. It was ESHB 615 as completely amended by the Senate amendments which was enacted into law and is now known as RCW 10.94.010, 10.94.020, 10.94.030, 10.94-.900, 9A.32.040, 9A.32.045, 9A.32.046, and 9A.32.047.

The majority grounds its determination of legislative intent on the omission of one section of HB 615 from SHB 615. To this end, the majority adopts the concurring opinion of Justice Horowitz in *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980), to wit:

> [T]he legislative history of the present death penalty statute shows that the legislature *expressly rejected* a proposed provision that would have authorized the impaneling of a capital sentencing jury in cases in which the defendant pleads guilty. House Bill No. 615, the original version of the statute, provided that: "If the trial jury has been waived, or if the defendant pleaded guilty to murder in the first degree, the death penalty proceeding shall be conducted before a jury impaneled for that purpose and such jury cannot be waived." House Bill No. 615, § 68. In enacting the bill, the legislature eliminated this provision.

(Italics mine.) *Martin, supra* at 19 (Horowitz, J., concurring). In other words, by omitting section 68, which was found in the prior draft of the death penalty statute, the majority reasons that the legislature must have intended to limit the applicability of the death penalty sentencing procedures to those defendants who plead "not guilty". Justice Horowitz called this omission an "express" rejection of section 68. I cannot agree.

First, if prior drafts of an act have any meaning whatsoever, they must be prior drafts of the law which was finally enacted. As has been shown, only the Senate death penalty scheme, attached to the House bill number, was before the legislature. I see no arguments by defendants or the majority here that prior drafts of the *enacted law* support their position that a defendant who pleads guilty is to be exempted from the statutory scheme.

Second, no *substantive provisions* of HB 615 *appear* in the House or Senate Journals. For the text of both HB 615 and SHB 615, reference must be made to the State of Washington Printed Bills of the Legislature, Forty–fifth Session, House, 601–715, 1977, Regular and Extraordinary Sessions (Printed Bills). It is obvious that the Printed Bills were relied on both by Justice Horowitz in *Martin, supra,* and the majority in the subject case, although neither opinion mentions them. Going behind the journals is not reliable for determination of legislative intent, *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 536 P.2d 157 (1975), particularly in the case of an omission in a subsequent draft, 82 C.J.S. *Statutes* § 355, at 752–53.

Even if the Printed Bills are proper sources of legislative intent, the majority's position is unsupported. We may draw a number of inferences from the exclusion of section 68. They are: (1) the exclusion was inadvertent, (2) in substantially paring HB 615 from its 116 sections down to the 10 sections substituted as SHB 615, the judiciary committee felt that section 68 was superfluous in the light of RCW 10.49.010, or (3) the committee wished a defendant who

pleaded guilty to escape the imposition of the death penalty, marking a radical change in the existing law. Whatever was the reason for the omission of section 68, it cannot stand as a statement of legislative intent. We know that not a single legislator ever voted for or against section 68 or any other section of HB 615. Furthermore, the House Journal fails to show that any of the legislators, when considering SHB 615, were directed to this supposedly intentional and certainly radical departure from long–established Washington law of providing for a sentencing jury after a defendant pleaded guilty to first degree murder. No inquiry is reflected in either the House or Senate Journal which indicates that the legislators considered that such a change in the law was before them. I submit that no such departure *was* before either legislative chamber. This court has previously cautioned

> against over–emphasis and over–reliance upon the fact or happenstance of successive drafts as an *absolute* determinant, rule, or tool for interpreting a statute.

*Hama Hama Co. v. Shorelines Hearings Bd., supra* at 449.

The challengers of this statute have failed to meet the burden imposed upon them by law. A statute is presumed to be constitutional. *In re Harbert,* 85 Wn.2d 719, 538 P.2d 1212 (1975). To overcome this presumption, the challenge must be proved beyond a reasonable doubt. *Sator v. Department of Revenue,* 89 Wn.2d 338, 572 P.2d 1094 (1977). This simply means that if there is *any* reason to hold a statute constitutional, the courts cannot find it unconstitutional. By harmonizing the two subject statutes, RCW 10.94.020 with RCW 10.49.010, which I believe was the legislature's intent, there is no need to hold the 1977 death penalty statutes unconstitutional. As noted above, there is more than one reasonable explanation for section 68's exclusion from SHB 615. It has not been proven, beyond a reasonable doubt, that the omission of section 68 was for the purpose of allowing defendants who plead guilty to escape the imposition of the death penalty procedures.

The majority concludes that the legislature intended a different punishment for aggravated murder, depending on whether a defendant pleaded guilty or not guilty. If this were true, is it not logical that, as SHB 615 and ESHB 615 moved through the legislative halls toward enactment, a sponsor or member would have advised the legislators that capital punishment under the provisions of the bill would only apply to aggravated murder in the event defendant pleaded not guilty and was, subsequently, convicted, and that if such defendant pleaded guilty, the maximum he could receive by way of punishment would be "life" with the possibility of parole.

The House and Senate Journals reflect that this death penalty bill was thoroughly debated, numerous amendments were offered—some were accepted and some were rejected; numerous questions were asked and points of order were raised and disposed of. Is it not strange that no mention was made of the type of punishment to be administered in the event a defendant pleaded guilty of an aggravated murder as opposed to not guilty? A permissible inference from such absence of such inquiry is that the legislators were well aware of RCW 10.49.010 which provided for sentencing procedures for defendants who plead guilty to murder. It is unthinkable for this court to "legislate" against the intent of the legislature.

Finally, the statute itself indicates that the legislature intended to make no distinction between those defendants who plead guilty and those who plead not guilty. Legislative intent is to be gleaned, first, if possible, from the statute itself. *In re Estate of Lyons*, 83 Wn.2d 105, 515 P.2d 1293 (1973). Section 6 of the enacted scheme, codified at RCW 9A.32.047, reads as follows:

In the event that the governor commutes a death sentence or in the event that the death penalty is held to be unconstitutional by the United States supreme court or the supreme court of the state of Washington the penalty under RCW 9A.32.046 shall be imprisonment in the state penitentiary for life without possibility of release or

parole. A person sentenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer, and the board of prison terms and paroles shall never parole a prisoner nor reduce the period of confinement. The convicted person shall not be released as a result of any type of good time calculation nor shall the department of social and health services permit the convicted person to participate in any temporary release or furlough program.

Life without possibility of parole, then, is the resulting sentence if a death sentence is commuted by the Governor or if the statutory scheme enacting the death penalty is held invalid by the courts. If defendant A pleads guilty to first degree murder and defendant B pleads not guilty to first degree murder, they must be treated equally before the law. If defendant B could be sentenced to life without possibility of parole, but defendant A could only face the lighter sentence of life with possibility of parole, the equal protection clause of the constitution would be violated. The legislature is presumed to act constitutionally thereby creating the presumption that an act is constitutional. *In re Harbert, supra.* In that RCW 9A.32.047 makes no distinction between the pleas of defendants (whether they plead guilty or not guilty) and that statute is presumed to be constitutional, that section demonstrates strong legislative intent that the death penalty scheme is to be triggered by either a plea of guilty or not guilty.

Also to be noted is the effect of RCW 9A.32.047 in the light of the majority opinion. The majority of this court has found the death penalty to be unconstitutional. The above cited section will operate to change the sentences of those now on death row to life without possibility of parole. The legislature had the foresight to enact a severability clause. RCW 10.94.900.

## III

Justice Utter's concurring and dissenting opinion states that RCW 10.94.020 and RCW 10.49.010 cannot be read in pari materia because to do so violates Const. art. 2, § 37, which reads:

No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length.

I disagree with Justice Utter's conclusion. RCW 10.94, as discussed in section I of this dissent, neither revises nor amends RCW 10.49.010. The death penalty statute is complete in itself. The enactment of the latter statute has no effect on the operation of the former statute. They both concern the sentencing for a defendant convicted of murder. However, RCW 10.49.010 merely allows the provisions of RCW 10.94.020 to be triggered if a defendant pleads guilty to the charge. Const. art. 2, § 37 has not been read in the past to bring within its ken all statutes which are read in pari materia. I see no reason to now make that change.

## IV

I concur in the majority's disposition of issues III and IV. As to issue III, however, I feel that a fifth question should be put to the jury: Shall the defendant be sentenced to death? to be answered simply with a "yes" or a "no". This final determination of imposition of the death penalty should not be taken from the province of the jury.

## V

I concur in Justice Rosellini's dissent as to issue V, whether death by hanging violates the eighth amendment to the United States Constitution. Additionally, I note that the legislature is better equipped to determine the mode of execution to be imposed. I take judicial notice of the fact that this very subject is currently before the Washington State Legislature. Unlike the legislature, this court can neither hear live testimony nor conduct hearings on this issue.

## VI
### CONCLUSION

The majority has found a clear, well reasoned and orderly statute to be ambiguous, and has fabricated legislative intent from impermissible inferences. Simply stated, this court has substituted its intent for that of our legislature. From the usurpation of the legislative power, I dissent.

I would uphold the constitutionality of the 1977 amendatory act providing for capital punishment and overrule *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980).

ROSELLINI, J., concurs with DORE, J.

DIMMICK, J. (concurring in part, dissenting in part)—I concur with the reasoning and result reached in the dissents of Justices Rosellini and Dore as to issue I, and would likewise overrule *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980). However, since *Martin* is stare decisis, and since the majority has held the death penalty unconstitutional, I address myself to issue II.

■■ The majority holds that "the State may not constitutionally seek life imprisonment without possibility of release or parole for those who are found guilty of aggravated first degree murder." I disagree with that holding.

RCW 9A.32.047 provides that if this court holds the death penalty unconstitutional, "the penalty under RCW 9A.32.046 shall be imprisonment in the state penitentiary for life without possibility of release or parole." The severability provision, RCW 10.94.900, indicates this directive can stand alone although other parts of the statute are held invalid. Given the unambiguous manifestation of legislative intent present here, we must heed this directive unless it is constitutionally infirm.

Is the present statutory scheme unconstitutional? I do not believe it is. The dispositive United States Supreme Court cases, *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968), and *Corbitt v. New Jersey,* 439 U.S. 212, 58 L. Ed. 2d 466, 99 S. Ct. 492 (1978),

only prohibit a state from *impermissibly* inducing a defendant to plead guilty and to forego his right to a jury trial. To assess the constitutionality of the inducement present in this case we must determine whether a defendant who pleads guilty and is given a life sentence which carries a possibility of parole is treated sufficiently different from a defendant who goes to trial before a jury and is sentenced to life imprisonment without a possibility of parole. Unlike the majority, I believe these two penalties are substantially similar, and the present statutory scheme, therefore, does not impermissibly encourage a defendant to plead guilty.

This court has clearly recognized that parole is granted strictly by grace through the Board of Prison Terms and Paroles. The discretion to grant or withhold this grace is virtually unfettered and unreviewable. *See State v. Fain,* 94 Wn.2d 387, 394–95, 617 P.2d 720 (1980); *In re George,* 90 Wn.2d 90, 94, 579 P.2d 354 (1978). Accordingly, a defendant who pleads guilty and receives a life sentence with a possibility of parole must expect he will serve a *life sentence.* He will, in fact, serve the identical sentence as a defendant who exercised his right to trial by jury and was sentenced to life without possibility of parole; unless the State deigns to exercise its discretion and mollify his life sentence. Furthermore, a defendant who goes to trial and is sentenced to life without a possibility of parole is not "without hope," as the majority states. See majority opinion, at 484. The Governor may commute an inmate's sentence at any time free from legislative or judicial restraint. For example, the sentences of at least 12 convicted murderers were commuted in the last 4 years.[3]

---

[3]The following former inmates, who were all sentenced to life for first degree murder, had their sentences commuted during the term of office of Governor Ray upon recommendation of the superintendent of the Washington State Penitentiary: (1) Michael Finnegan, sentenced 11/6/70, commuted 1/12/81; (2) Edmond Gray, sentenced 4/22/60 to three consecutive life sentences, commuted 1/12/81; (3) Kelly D. Messinger, sentenced 12/20/71, commuted 1/8/81; (4) Harry L. Van DeVenter, sentenced 2/28/69, commuted 1/8/81; (5) John E. Henault, sentenced

The two penalties, while obviously not identical, are substantially similar. That is all the constitution requires. Here, as in *Corbitt,* a defendant who pleads guilty and is sentenced to life with a possibility of parole is not substantially better off than a defendant who goes to trial and is sentenced to life without a possibility of parole. Under our statutory scheme, as under New Jersey's in *Corbitt,* a defendant who freely abandons his right to trial by jury may receive the same penalty as the defendant who makes the State prove his guilt at trial. Given this similarity of penalties, *Jackson*'s narrow prohibition against needless encouragement of guilty pleas, 390 U.S. 583, is clearly absent in this case. I accordingly dissent from issue II of the majority opinion.

I concur with the majority on issues III and IV.

HICKS, J., concurs with DIMMICK, J.

BRACHTENBACH, C.J., concurs with DIMMICK, J., as to issue II.

ROSELLINI, J.—In my dissent I have upheld the death penalty statute in its entirety, which would provide for the penalty of life imprisonment without possibility of parole. In order to avoid any misunderstanding, I am also signing Justice Dimmick's opinion.

Reconsideration denied May 20, 1981.

---

5/26/64, commuted 1/5/81; (6) Donald Mesaros, sentenced 4/6/62, commuted 10/22/80; (7) Richard A. Lee, sentenced 6/7/74, commuted 10/22/80; (8) Robert Lee Reed, sentenced 2/20/74, commuted 10/22/80; (9) Katherine L. Huff, sentenced 11/3/67, commuted 5/16/78; (10) Ronnie J. Nichols, sentenced 3/18/66, commuted 5/16/78; (11) Robert Huson, sentenced 5/26/67, commuted 3/1/78; (12) Anthony Takahashi, sentenced 3/31/67, commuted 3/30/77.